# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 3703 | **DATE** | 6/1/2001 |
| **CASE TITLE** | Chester Boyce vs. Executive Director of Cook County Department of Corrections | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** Defendant's motion for summary judgment [doc. #: 94] is granted. The Court directs the Clerk of the Court to enter final judgment for defendants and against the plaintiff on Counts 1 and III of the First Amended Complaint, pursuant to Federal Rule of Civil Procedure 58. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | JUN 0 4 2001 |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | 6/1/2001 |
| | Copy to judge/magistrate judge. | date mailed notice |

courtroom deputy's initials JJK

ED-7 FILED FOR DOCKETING
01 JUN -1 PM 4: 03

Date/time received in central Clerk's Office

JJK
mailing deputy initials

Document Number

100

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CHESTER BOYCE, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>EXECUTIVE DIRECTOR OF )<br>COOK COUNTY DEPARTMENT )<br>OF CORRECTIONS, *et al.*, )<br>)<br>Defendants. ) | Case No. 96 C 3703<br><br>Magistrate Judge Sidney I. Schenkier<br><br>DOCKETED<br>JUN 0 4 2001 |

## MEMORANDUM OPINION AND ORDER[1]

This is a civil rights case arising under 42 U.S.C. §1983, brought by Chester Boyce a former inmate of the Cook County Department of Corrections ("CCDOC"). The defendants remaining in the case are: the Executive Director of CCDOC ("Executive Director");[2] Lieutenant Jeffrey Malek ("Lt. Malek"); and Lieutenant Leroy Moore ("Lt. Moore").[3] The plaintiff's amended complaint proceeds under two theories: (1) a failure to protect plaintiff from harm at the hands of other inmates

---

[1]Pursuant to 28 U.S.C. § 636(c), on April 4, 1997, the parties consented to the jurisdiction of a magistrate judge to issue all rulings in the case, including the entry of final judgment (doc. # 26). On September 25, 2000, the Honorable Ian H. Levin recused himself from further proceedings (doc. #88), and on September 29, 2000, this case was randomly reassigned to this Court (doc. # 89).

[2]On January 26, 1999, Magistrate Judge Levin granted the defendants' motion to substitute pursuant to Fed. R. Civ. P. 25(d); as a result, the defendant J.W. Fairman was dismissed and the title of Executive Director of CCDOC was substituted as the defendant.

[3]The remaining defendants named in the amended complaint, Sgts. Brown, Healy, White and Johnson, as well as Superintendent Serwinsky, were never served with a copy of the original complaint (doc. #s 12, 14, 15, 16, and 18), and the statute of limitations has now run on any claims against them. While Section 1983 does not contain an express statute of limitations, a federal court must adopt the forum state's limitations period for personal injury claims. *See Wilson v. Garcia*, 471 U.S. 261, 276 (1985). The correct statute of limitations for Section 1983 actions filed in Illinois is two years as set forth in 735 ILCS § 5/13-202. *See Ashafa v. City of Chicago*, 146 F.3d 459, 462 (7th Cir. 1998).

<span style="float:right">100</span>

(Count I); and (2) a failure to provide adequate medical care to plaintiff, which allegedly resulted in the loss of vision in his left eye (Count III).[4]

Defendants have moved for summary judgment on these remaining claims (doc. # 94). For the reasons that follow, the Court grants the defendants' motion for summary judgment.

## I.

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. ("Rule") 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249-50; *Flipside Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988).

In deciding a motion for summary judgment, the Court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. The Court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Rendfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987), and draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990). Credibility determinations, weighing evidence and drawing reasonable inferences are jury functions, not those of a judge when deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255.

---

[4]Count II of the amended complaint was dismissed on October 29, 1998 (doc. # 65). Count IV was rendered moot by an earlier order denying plaintiff's motion to add additional defendants (doc. # 23). In addition, unnamed defendants John Doe I thru X were voluntarily dismissed on April 4, 1997 (doc. # 24).

"A court's obligation to draw all reasonable inferences in favor of a non-moving party, however, does not require that court to stretch existing evidence to reach conclusions or bolster arguments it could not otherwise support." *Frost National Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 2001 WL 175342, * 6 (7th Cir., Feb. 23, 2001). Mere conclusory assertions, unsupported by specific facts, are not sufficient to defeat a proper motion for summary judgment. *Bragg v. Navistar Intern. Trans. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) (summary judgment affirmed; "conclusory statements that the testing conditions were less favorable" to plaintiff than to male co-workers was insufficient to "affirmatively demonstrate [] that a genuine issue of fact exists" on the issue of disparate treatment); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) ("conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact").

## II.

The following facts are material and without genuine dispute.[5] Plaintiff, Chester Boyce, was housed in CCDOC on charges of murder and aggravated battery with a firearm, beginning on June 8, 1992 (Defs.' Facts ¶ 4; Defs.' Ex. D at 7). He was convicted of those charges in May 1994 (Defs.' Facts ¶ 44, and he remained at CCDOC until February 17, 1995 (*Id.*, and Defs.' Ex. D at 8). Mr. Boyce was housed in Division 1, Tier C-4 from February 1993 to June 8, 1994, and in Division 1, Tier H-1 from June 8, 1994 to June 30, 1994 (Defs.' Facts ¶¶ 5, 6).

---

[5]The facts alleged by plaintiff fall into three categories: (1) facts alleged by plaintiff under oath in his deposition of which he has personal knowledge and could therefore testify to at trial; (2) facts alleged in his unverified original complaint (which has been superceded by the amended complaint), *Schmidt v. Nissan Motor Acceptance Corp.*, 104 F.Supp.2d 955, 957 (N.D. Ill. 2000); *Kelly v. Crosfield Catalysts*, 135 F.3d 1202, 1204 (7th Cir. 1998); and (3) inadmissible hearsay statements. The first category of statements, if admitted or not genuinely disputed, are recited above as undisputed material facts. The latter two categories of facts are not material because they are not admissible as competent evidence.

3

Defendants, Lieutenants Moore and Malek, were co-supervisors in Division 1 of CCDOC during 1994; Lt. Moore was the senior supervisor (Pl.'s Add'l Facts ¶ 71). In 1994, lieutenants supervised the officers and sergeants assigned to that division (Pl.'s Add'l Facts ¶ 72). Officers were responsible for monitoring inmates in the living unit, and they would periodically make "catwalk" checks outside the cells on each tier in accordance with shift change procedures (Defs.' Facts ¶¶ 7, 14).[6]

In June 1994, there were three different shifts in Division 1, Tier C-4, and each shift had a different officer, sergeant and lieutenant. Complaints by prisoners could be made to any one of these individuals on any one of the three shifts (Defs.' Facts ¶ 9), as well as to clergy and paramedics, who visited the tiers on a regular basis (Defs.' Facts ¶¶ 12, 50), and social workers, who visited the tiers if requested by a prisoner (Defs.' Facts ¶ 10). In June 1994, there was no protective custody in Division 1 (Defs.' Facts ¶ 13).

On June 1, 1994, at sometime between 6:00 and 7:00 p.m., plaintiff was allegedly attacked and beaten by several other inmates (Pl.'s Add'l Facts ¶ 66). As a result of the alleged attack, plaintiff's eyes became swollen and he bled from his left eye and from his mouth (*Id.* ¶ 68). Plaintiff had no idea the alleged attack was going to occur, and he does not know who the attackers were or why they assaulted him (Defs.' Facts ¶¶ 26, 28). Plaintiff never filed a grievance for this alleged beating with the officer on duty when he made a catwalk check (Defs.' Facts ¶ 11, 14), and there is no mention of an altercation involving plaintiff during the 12:00 to 8:00 p.m. shift of June 1, 1994 in the Tier C-4 log book (Defs.' Facts ¶ 16).

---

[6] Although plaintiff ostensibly disputes ¶ 7, his dispute is about whether the officer was assigned to one tier or to two tiers. This dispute is not material.

Plaintiff alleges that after the attack, he noticed that his eyes were getting gradually weaker (Pl.'s Add'l Facts ¶ 87). However, plaintiff did not seek or receive any medical attention between June 1, 1994 and June 7, 1994 (Pl.'s Add'l Facts ¶¶ 8, 18, 79). On or about June 3, 1994, Officer Brown approached plaintiff during a catwalk check and inquired into plaintiff's condition. Plaintiff responded that he was okay and he did not request medical attention at that time (Defs.' Facts ¶¶ 8, 17, 50).

A log entry made on June 3, 1994, states that "several inmates told R-O there is a conflict brewing on the [C-4] tier" (Pl.'s Add'l Facts ¶ 75). This entry does not identify plaintiff as being involved in or a target of the conflict; and there is no evidence that this entry was made or seen by any defendant (Defs.' Reply ¶ 75).

However, on June 7, 1994, plaintiff approached an officer during lock-up and informed him that he wanted to be moved off of Tier C-4 (Defs.' Facts ¶ 19; Pl.'s Add'l Facts ¶ 69), and an entry was made in the log book that states, "Boyce, Chester . . . refuses to remain on the tier. Supervisor notified. Appeared to have swollen eyes . . . ." (Pl.'s Add'l Facts ¶ 76). On June 8, 1994, an entry was made in the log book that states, "R-O was informed by Officer Ware that inmate Boyce, Chester, refused to lock up. Officer Ware said eyes appear to be swollen . . . Inmate Boyce was then removed to Cermak" (Pl.'s Add'l Facts ¶ 77; Defs.' Facts ¶¶ 19-20).

On June 8, 1994, Dr. Patrirnakos, a physician at Cermak, examined plaintiff's eyes and gave him eye drops (Pl.'s Add'l Facts ¶ 80). When he returned to CCDOC later, on June 8, plaintiff was placed in the pump room and later moved to Tier H-1 pursuant to Lt. Malek's orders (Defs.' Facts ¶ 21), because plaintiff refused to be sent back to Tier C-4 (Pl.'s Add'l Facts ¶ 81). The plaintiff characterizes his demand to be moved as a request for protection from further assault (Defs.' Facts

5

¶ 28; Pl.'s Resp. ¶ 28). However, there are no allegations that plaintiff knew of any imminent or planned assault, or that he requested protection from defendants related to any specific assault or threat (Defs.' Reply ¶ 28). Nor does plaintiff allege that he complained about being assigned to Tier H-1.[7]

On June 14, 1994, plaintiff alleges that he was attacked a second time by fellow inmates at approximately 1:00 p.m. in the H stairwell as he and the other inmates were returning from yard exercise (Pl.'s Add'l Facts ¶¶ 84, 85). At that time, an inmate in Division 1, Tier H-1, would be excused from yard exercise if he had a medical reason, doctor's appointment or was afraid of being assaulted. The inmate would be placed in the holding cell in the boulevard instead of going to yard (Defs.' Facts ¶ 23). On this day, plaintiff requested to be excused from yard exercise (Pl.'s Add'l Facts ¶ 84), but the defendants state that plaintiff gave no reason for his request (Defs.' Reply ¶ 84) and so the request was denied (Pl.'s Add'l Facts ¶¶ 23, 84). No inmates from Tier C-4 participated in yard with the Tier H-1 inmates (Defs.' Facts ¶ 30).

In order for an inmate to travel from the boulevard through the H stairwell to Tier H-1, an officer must unlock the door on the boulevard and another officer has to unlock the door on Tier H-1 (Defs.' Facts ¶ 22). The parties genuinely dispute whether any of the prison guards were present during and/or witnessed the second attack in the H stairwell (Defs.' Facts ¶ 35; Pl.'s Resp. ¶ 35). The plaintiff bases the dispute on deposition testimony by Otha Anderson, a fellow inmate and an alleged eyewitness to the attack. Mr. Anderson claims (somewhat inconsistently) that a guard, Ms.

---

[7]Plaintiff inconsistently states that he asked to be taken to Cermak on June 8, 1994 for a follow-up appointment with Dr. Patrirnakos (Pl.'s Add'l Facts ¶ 83). The Court believes plaintiff must be referring to June 9, not June 8. (Pl.s' Add'l Facts ¶ 80). On June 9, 1994, plaintiff requested to go back to Cermak to see Dr. Patrirnakos for a follow-up examination that plaintiff alleges Dr. Patrirnakos requested (Pl.'s Add'l Facts ¶¶ 80, 83). This request was denied (Pl.'s Add'l Facts ¶ 83).

Clark or Ms. Washington (he cannot remember which one), saw or "possibly" saw plaintiff being attacked when the H-stairwell door opened during the attack (Defs.' Ex. L, Anderson Dep. at 19-21). However, neither Guard Clark nor Guard Washington is a defendant, and plaintiff offers no facts that these guards deliberately failed to protect him during the attack or failed to provide for his medical needs.[8]

Plaintiff does not know who attacked him (Defs.' Facts ¶¶ 26, 27, 29). Moreover, the plaintiff did not file a grievance, and the log book of June 14, 1994, for Division 1, Tier H-1, on the 12:00 to 8:00 p.m. shift, does not mention any incidents involving the plaintiff; there are also no medical records that chronicle the attack or any resultant injuries (Defs.' Facts ¶ 24; Defs.' Reply Facts ¶¶ 85-86). Nonetheless, plaintiff immediately received medical treatment from a paramedic in the dispensary after the attack (Defs.' Facts ¶ 33); and he was seen by the sick call doctor several times after June 14, 1994, especially for his eyes, which he says grew gradually weaker (Pl.'s Add'l Facts ¶¶ 86-87).

On June 30, 1994, plaintiff was moved from Division 1 to Division 6 (Defs.' Facts ¶ 59). Once he arrived in Division 6, plaintiff went to sick call several times (Defs.' Facts 60). No officer or any defendant ever refused to send him to the dispensary for medical attention (Id.). In fact, plaintiff admits that on July 14, 1994 he was seen at Cermak Health Services. Plaintiff also admits that on numerous occasions since July 14, 1994, he has been seen at Cermak and the Cook County

---

[8]Plaintiff's statement that "Lt. Malek arrived in the H stairwell with other officers as the second attack occurred" (Pl.'s Resp. ¶ 35), is an incorrect characterization of plaintiff's own deposition testimony. Plaintiff did not testify that Lt. Malek arrived in the stairwell "as the second attack occurred"; rather, he testified that Lt. Malek approached him from the boulevard when he "got out of the well" (Defs.' Ex. D, Boyce Dep. at 107-08), which would have been *after* the attack. The plaintiff's assertions regarding Lt. Malek therefore fail to create a genuine, let alone material, issue.

and University of Illinois Hospitals, where he has undergone multiple eye surgeries (Defs.' Facts ¶¶ 62-63). The plaintiff alleges that he lost complete sight in his left eye in early September 1994 (Pl.'s Add'l Facts ¶ 90).

Cermak Health Care is a separate entity from CCDOC and an extension of Cook County Hospital (Defs.' Facts ¶ 42; Defs.' Reply Facts ¶ 90). Cermak is responsible for the inmates health at CCDOC (Defs.' Facts ¶ 42). The CCDOC policy is that when an officer finds an inmate in need of medical attention, he notifies a supervisor, who in turn notifies a paramedic (Defs.' Facts ¶ 43). The paramedic then makes the "ultimate decision" whether to send the inmate to sick call or to Cermak, if necessary (Defs.' Facts ¶¶ 43-44). The plaintiff did not seek specialized care or eye treatment from Cermak Health Services (Defs.' Facts ¶¶ 47-48) by asking defendants or paramedics for such services (Defs.' Facts ¶¶ 48, 50). The plaintiff has no knowledge of, nor has he ever observed, any acts or written policy by defendants to deny inmates access to Cermak (Defs.' Facts ¶ 51). The plaintiff also has no knowledge of anything defendants did or said (deliberately or otherwise) to prevent or intend to prevent him from being seen by a paramedic in the dispensary or at Cermak (Defs.' Facts ¶¶ 54-55) or from receiving adequate medical care (*Id.* ¶ 55).[9] Plaintiff admits that the paramedic, not the jail staff, is responsible for informing sick call of plaintiff's medical condition, and it is the responsibility of the sick call doctor to refer an inmate to a specialist at Cermak. The approval of jail staff, such as a lieutenant, is not required (Defs.' Facts ¶ 57); and

---

[9] Plaintiff points to one occasion on which he requested to be sent to Cermak, but was only seen at the CCDOC dispensary (Defs.' Reply ¶ 90). The defendants contend that this was an inadvertent mistake caused by a communication breakdown between the CCDOC sick call/dispensary and Cermak (Defs.' Reply ¶ 90). Plaintiff has offered no evidence to contradict that explanation. One instance of a communication breakdown does not, given the other facts in the record, constitute deliberate indifference and certainly not by the defendants.

the defendants do not decide whether to order eye examinations (Defs.' Facts ¶ 58). Finally, plaintiff has no knowledge that defendants actually knew plaintiff needed medical care (Defs.' Facts ¶ 53).[10]

Plaintiff alleges that in late November or early December 1994, Dr. Patrirnakos examined him and concluded that the retina in his left eye had detached (Pl.'s Add'l Facts ¶ 91). Plaintiff alleges that about the same time, Dr. Kurtz reached the same conclusion and determined that there was "a lot of scar tissue" that "was caused by the beatings" (Pl.'s Add'l Facts ¶ 93). Dr. Alino, according to plaintiff, reached the same conclusions as Dr. Kurtz (Pl.'s Add'l Facts ¶ 94). Finally, plaintiff alleges that in late November or the middle of December, surgery was performed to re-attach plaintiff's retina in his left eye (Pl.'s Add'l Facts ¶ 95). According to plaintiff, "Dr. Kurtz indicated that the outcome of the surgery would have been better if so much time had not passed which allowed the scar tissue to set in" (Pl.'s Add'l Facts ¶ 96). These alleged statements by Drs. Patrirnakos, Kurtz and Alino are inadmissible hearsay and fail to create a genuine issue of material fact because there is no testimony from these doctors, nor any statements or reports from the doctors. Thus, plaintiff's allegations are based only on his own assertions about what the doctors allegedly told him.

## III.

Generally, the Constitution does not impose upon the State an affirmative duty to provide for the safety and security of its citizens. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195-98 (1989). However, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some

---

[10]The plaintiff's denial of this fact is conclusory and without evidentiary support. Defendants' assertion of the fact, supported by Mr. Boyce's deposition testimony, is therefore deemed admitted. *See Bragg*, 164 F.3d at 377.

responsibility for his safety and general well being." *Id.* at 199-200. Thus, in *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment, applied to the States through the Due Process Clause of the Fourteenth Amendment, imposes upon the State a duty to provide adequate medical care to incarcerated persons. 429 U.S. at 101-05. The Court has also recognized that the Eighth Amendment imposes a duty upon prison officials to "take reasonable measures to ensure the safety of the inmates" and to protect them from harm at the hands of others. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).[11]

But, every failure to provide medical care or every attack by other inmates does not rise to the level of a constitutional violation. To establish a claim under the Eighth Amendment, the plaintiff must prove that the prison officials acted with the requisite culpable state of mind, which has been defined as "deliberate indifference" to a substantial risk of harm. *Farmer*, 511 U.S. at 834. Courts have had many occasions to expound upon the meaning of deliberate indifference. Deliberate indifference entails something more blameworthy than mere negligence, *Estelle*, 429 U.S. at 106-07, yet requires something less than acts or omissions for the purpose of punishing the inmate. *Farmer*, 511 U.S. at 835. Deliberate indifference has been analogized to recklessness in the criminal law

---

[11]Rather than construing plaintiff's failure to protect claim as an Eighth Amendment violation, the defendants identify plaintiff's claim for protection as arising under the due process clause of the Fourteenth Amendment, which protects *pretrial* detainees from punishment by placing a duty upon jail officials to protect such individuals from violence at the hands of other inmates. While the Fourteenth Amendment applies to pretrial detainees and the Eighth Amendment applies to inmates, "there is 'little practical difference between the two standards.'" *See Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001) (quoting *Weiss v. Cooley*, 230 F.3d 1027, 1031 (7th Cir. 2000)). In any event, at the time of the alleged violations beginning June 1994, plaintiff already had been convicted of the charged offenses and thus was no longer a pretrial detainee (Pl.'s Resp. at 8). Thus, we analyze his claim under the Eighth Amendment.

sense. *Id.* at 837; *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Therefore, a prison official can only be found liable if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. However, to find actual knowledge, the knowledge need not be specific. *Farmer*, 511 U.S. at 843-44. An "official cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault" and "[i]t does not matter whether the risk comes from multiple sources or from one source, and it does not matter whether the prisoner is at risk for reasons personal to him or because all the prisoners face the risk." *Mayoral v. Sheahan*, 245 F.3d 934, 939 (7th Cir. 2001).

An individual in a supervisory role cannot be held liable for a constitutional deprivation unless the person was personally involved in the wrongful conduct such that he or she caused or participated in the alleged violation. *Moore v. Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993); *Gibson v. City of Chicago*, 910 F.2d 1510, 1523 (7th Cir. 1990). Put another way, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). The issue of knowledge of an excessive risk is a question of fact and may be inferred from circumstantial evidence or found due to the obviousness of the risk. *Farmer*, 511 U.S. at 842. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" necessary to establish an Eighth Amendment violation. *Farmer*, 511 U.S. 837-38. Consequently, a prison official does not act with deliberate indifference -- and there is no liability -- if he or she has responded reasonably to a known

risk of harm, even if the harm is ultimately not averted. *Id.* at 844; *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997).

With these governing principles in mind, we discuss each of plaintiff's claims.

**A.    The Failure to Protect Claim.**

Plaintiff's amended complaint alleges violations of his constitutional rights in that the defendants failed to take reasonable measures to ensure his safety. Plaintiff asserts that his claims are against Lieutenants Malek and Moore in their individual and official capacities.[12] The claim against the Executive Director is brought against him in his official capacity, and as such it operates as a claim only against the local entity itself. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 n. 55 (1978); *Holmes v. Sheahan*, 930 F.2d 1196, 1199 (7th Cir. 1991).

*1.    Lieutenant Moore.*

A thorough examination of the record reveals that plaintiff has offered no evidence by which Lt. Moore can be shown to have directly participated in the decisions concerning plaintiff's housing. This would not necessarily be fatal to plaintiff's claim, since supervisors can be held liable for their deliberate indifference to the misconduct of their subordinates. *See Jones*, 856 F.2d at 992-93. Plaintiff argues that Lt. Moore's position as a supervisor coupled with the presence of three logbook

---

[12]The amended complaint alleges violations by Lts. Malek and Moore in their "official" not "individual" capacities. Nonetheless, both plaintiff and defendant brief the issue of liability against these defendants in their *individual* capacities. The Court will examine the issue as if the claims were brought against the lieutenants in both their individual and official capacities. *See Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991) ("[w]here the complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint"). This is the majority view in the circuits. *See Biggs v. Meadows*, 66 F.3d 56, 59-60 (4th Cir. 1995) (collecting cases). *But see Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997) (requiring individual capacity suits to be clearly pled to ensure adequate notice to defendants and to apprize the court of relevant Eleventh Amendment issues).

entries concerning plaintiff is sufficient to establish knowledge of the alleged threat to plaintiff's safety (Pl.'s Mem. at 11-12). But, plaintiff points to nothing in the record that would allow a jury to reasonably find that supervisors were required to examine the logbooks or that it was Lt. Moore's routine practice to do so. Even if there was a CCDOC policy requiring supervisors to examine the log books in June 1994, a mere failure to do so would only constitute negligence and would not be actionable. Therefore, there is no evidence in the record that tends to establish Lt. Moore's knowledge of plaintiff's alleged plight and, by definition, he could not be deliberately indifferent to a threat he did not perceive. *See Farmer*, 511 U.S. at 837-38 ("official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

   2.   *Lieutenant Malek.*

Unlike the situation with Lt. Moore, Lt. Malek's personal involvement in the housing decisions is well documented in the record: Lt. Malek refused to place plaintiff in protective custody despite his requests (Pl.'s Mem. at 10). Since Division 1 did not have protective custody in June 1994 (Def.'s Facts ¶ 13), to place plaintiff in protective custody at that time, the defendants would have had to transfer him out of Division 1. It is the defendants' failure to transfer him out of Division 1 and into protective custody that plaintiff relies on to establish his case against Lt. Moore (Pl.'s Mem. at 11).

A refusal to provide protective custody is not dispositive of the issue of an official's deliberate indifference. *Lewis v. Richards*, 107 F.3d 549, 553-54 and n.5 (7th Cir. 1997) (even if prison has a policy of providing protective custody to any offender who requests it, officials' failure

to follow internal procedures does not mean a constitutional violation has occurred; the plaintiff must show the officials "consciously ignored" threats to his or her safety or "took no precautions to avoid a known hazard"). Plaintiff's argument falls short of establishing that the refusal constituted deliberate indifference on the facts in this record.

*First*, there is no evidence in the record that establishes the CCDOC procedure for transferring a prisoner from one division to another in effect in June 1994. And, except for plaintiff's unfounded allegations (Pl.'s Mem. at 12), there is no evidence that Lt. Malek had the authority to execute an inter-division transfer in June 1994. *Second*, plaintiff's argument fails to take into account Lt. Malek's actions upon learning of plaintiff's stated concern for his safety. Faced with plaintiff's concerns, Lt. Malek transferred him to a different tier with a different inmate population (Boyce Dep. at 79-83). Plaintiff offers no evidence that Lt. Malek's actions were unreasonable, given that plaintiff did not know the identity of his attackers, why they had attacked him, or any affiliations that they might have had (Def.'s Facts ¶¶ 26, 27). Therefore, plaintiff did not convey – nor could he have conveyed – any information to Lt. Malek that would have led Lt. Malek to believe that the transfer to H-1 was unreasonable or would not have alleviated the alleged threat to plaintiff's safety. Lt. Malek's response to plaintiff's fears precludes a finding of deliberate indifference. *See Farmer*, 511 U.S. at 844; *Doe v. Welborn*, 110 F.3d at 524. *See also Lewis*, 107 F.3d at 553 (finding transfer to a different area in the prison, rather than placement in protective custody, sufficient to defeat plaintiff's claim of deliberate indifference).

3. *Executive Director.*

In order to maintain a Section 1983 action against a municipal entity, the plaintiff must prove that his alleged constitutional injury was precipitated by an official policy or custom of the municipal entity. *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985); *Holmes*, 930 F.2d at 1199. Liability cannot be imposed upon a municipality solely because it employs the individual who violated the plaintiff's rights; *respondeat superior* does not apply. *Monell*, 436 U.S. at 691. The plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404 (emphasis in original). A claim that the municipal entity's policy or custom itself violates federal law, or authorizes an employee to do so, presents a fairly straightforward case. *See Tuttle*, 471 U.S. at 822 (holding that one application of an unconstitutional policy fulfills the requirements of culpability and causal connection). However, where "a plaintiff seek[s] to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights, [he] must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407. The Court explained that a municipal entity's continued adherence to a policy that the policy makers know or should have known caused the deprivation of rights may establish the deliberate indifference necessary to establish its liability. *Id.*

The gravamen of plaintiff's case against the Executive Director is that CCDOC's policy of failing to provide for protective custody in Division 1 precipitated the alleged violation of plaintiff's

15

constitutional rights that occurred on the June 14 attack (the absence of a protective custody wing is irrelevant to the June 1 attack, as plaintiff had not sought protective custody prior to that time). But, "a single incident of unconstitutional activity is not sufficient to impose liability . . . unless proof of the incident includes proof that it was caused by an existing, unconstitutional policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 471 U.S. at 823-24. Here, the plaintiff has come forward with no authority – and this Court has found none – to support the proposition that a lack of protective custody constitutes an unconstitutional policy.

Certainly, a plaintiff can establish an issue of material fact regarding deliberate indifference by showing a municipality's continued adherence to a policy that the policy makers knew or should have known caused the deprivation of rights. However, such cases generally require a pattern of constitutional violations from which the municipal entity's knowledge can be imputed or inferred. *See Brown*, 520 U.S. at 407 (discussing Section 1983 liability for an inadequate training claim). Here, plaintiff has not come forward with evidence of a pattern of alleged constitutional violations stemming from CCDOC's lack of protective custody in Division 1 in June 1994. Therefore, on this record, there is no evidence to support the proposition that CCDOC's policy makers knew or should have known that the policy would lead to a deprivation of rights and, consequently, CCDOC cannot be held liable under this theory.

Alternatively, plaintiff may seek to establish CCDOC's deliberate indifference with "proof that . . . [it]'s . . . authorized decision maker has intentionally deprived [him] of a federally protected right." *Brown*, 520 U.S. at 405. Presumably, this is what plaintiff intends to do by alleging that the Executive Director took no action in response to plaintiff's June 9 letter outlining his fears and desire to be transferred (Pl.'s Mem. at 13). At the outset, we note that the alleged June 9 letter has not been

16

produced as evidence by the plaintiff, so there is no proof that the Executive Director received such a letter. However, assuming he did, to satisfy the deliberate indifference standard, the Executive Director must have known that the second attack would occur or that there was an "excessive risk" that it would occur. *Farmer*, 511 U.S. at 837. The plaintiff himself has admitted that he had no prior knowledge that the second attack was going to occur, and he has offered no other evidence tending to show that any of the defendants – especially the Executive Director – did either. Given the undisputed material facts, it would have been entirely reasonable for the Executive Director to assume that the alleged threat to plaintiff's safety had been ameliorated by moving plaintiff from Tier C-4 to Tier H-1.

Lastly, plaintiff seeks to establish CCDOC's liability based upon the alleged refusal to excuse him from yard on the day of the second attack. However, the defendants have come forward with uncontested testimony establishing that an inmate would be excused from yard if he feared attack by others (Malek Dep. at 49; Moore Dep. at 42). Furthermore, plaintiff's testimony concerning his request to be excused and the guards' denial of this request on the day of the second attack does not contradict this testimony. Plaintiff's testimony merely establishes that he told the guards he did not want to go to yard, without giving a reason – and without expressing a fear of attack (Boyce Dep. at 89-90). As a result, plaintiff did not raise a valid concern that would have entitled him to be excused from yard pursuant to CCDOC policy, and the officer's response was consistent with this policy. Therefore, plaintiff has failed to raise any genuine issues of material fact that would allow a reasonable jury to find that CCDOC acted with deliberate indifference to plaintiff's safety.

## B. Failure to Provide Adequate Medical Care.

To prevail on a claim of a failure to provide medical care, a plaintiff must prove that prison officials acted with "deliberate indifference to *serious* medical needs." *Estelle*, 429 U.S. at 106 (emphasis added). *See also Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997); *Higgins v. Correctional Medical Services of Illinois, Inc.*, 8 F.Supp.2d 821, 827-28 (N.D. Ill. 1998) (citing *Estelle*, 429 U.S. at 97; *Farmer*, 511 U.S. at 834). The test is conjunctive and the absence of one element – either (1) serious medical need or (2) deliberate indifference – will be fatal to the claim on summary judgment. *Higgins*, 8 F. Supp. 2d at 827-828.

The requirement of a "serious medical need" encompasses "medical conditions far less critical than 'life threatening.'" *Gutierrez*, 111 F.3d at 1370-71 (noting that in *Estelle* the Supreme Court never questioned whether plaintiff's back injury constituted a serious medical need). The Supreme Court "made clear that the obligation extends not only to those cases in which the denial of care 'may actually produce physical torture or a lingering death' but also those in which 'denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.'" *Id.* at 1371 (quoting *Estelle*, 429 U.S. at 103). This circuit has defined a serious medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Guitierrez*, 111 F.3d at 1373 (quoting and adopting the standard set forth in *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)). Once a serious medical need is established, the deliberate indifference element is analyzed in accordance with the standards outlined above.

We assume for purposes of the motion that plaintiff's eye condition constituted a serious medical need; we thus consider plaintiff's claim that each defendant was deliberately indifferent to that need.

### 1. Lieutenant Moore.

The evidence implicating Lt. Moore in the decisions regarding plaintiff's medical care is thin at best. The only evidence of Lt. Moore's direct knowledge that plaintiff offers is his own recitation of an alleged statement by his cellmate on Tier C-4 (Boyce Dep. at 142-44). Insofar as the statement is offered to prove the truth of the matter asserted (*i.e.*, that the conversation actually occurred and what was said), it is hearsay and inadmissible. Fed. R. Evid. 801, 802.

The only other argument offered to establish Lt. Moore's deliberate indifference is his supervisory capacity and the presence of the log book entries. However, a supervisor's deliberate indifference cannot be premised upon his supervisory capacity alone. To be deliberately indifferent, the supervisor "must know about the [wrongful] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones*, 856 F.2d at 992. Here, plaintiff's only admissible evidence tending to establish Lt. Moore's knowledge of his medical needs is the log book entries. Yet, as noted above, plaintiff has not introduced evidence tending to show that it was CCDOC policy or Lt. Moore's personal practice to review those entries.

In addition, the entries merely state that plaintiff's eyes appear to be swollen (Moore Dep. at 26-31). This alone cannot be sufficient to establish an excessive risk to plaintiff's health, nor can the risk be considered so obvious that Lt. Moore's knowledge can be inferred. *Farmer*, 511 U.S. at 842. In *Higgins*, the court held that "for something to be truly obvious, a consideration of the

underlying facts will necessarily lead to a single conclusion." *Higgins*, 8 F.Supp.2d at 831. Here, relying solely upon the log book entries, a consideration of all the facts (*e.g.,* a written statement that plaintiff's eyes appear to be swollen) does not inexorably lead to the conclusion that there was an excessive risk to plaintiff's health.[13] Therefore, there is not sufficient evidence to establish a genuine issue of material fact as to Lt. Moore's deliberate indifference to plaintiff's medical needs.

    2.   *Lieutenant Malek.*

Plaintiff advances similar arguments with respect to Lt. Malek's alleged deliberate indifference to his medical needs. Insofar as plaintiff argues liability premised upon Lt. Malek's supervisory capacity and the log book entries, we reject these arguments based on the reasoning set forth above.

Plaintiff also alleges that Lt. Malek was aware of his serious injuries due to their meeting on June 8. However, at that time, plaintiff had just returned from Cermak and Cook County Hospital, and he presented no evidence to show that he relayed the seriousness of his medical needs or the need for further treatment to Lt. Malek. Assuming that Lt. Malek did perceive the serious nature of plaintiff's medical needs, nowhere in the record does it show how he disregarded that risk and personally failed to provide for plaintiff's medical needs. For instance, following the second attack, plaintiff saw Lt. Malek in the basement and he was allowed to go the division's dispensary. Also, Lt. Malek's alleged "disregard" of the risk to plaintiff when he failed to check on plaintiff's treatment in the days following the alleged attacks constitutes negligence at worst, and it therefore is not sufficient to impose liability.

---

[13]We look only to the log books for this inference because the plaintiff argues that those entries alone are sufficient to establish Lt. Moore's knowledge of plaintiff's condition.

3. *Executive Director.*

Plaintiff has presented no evidence of an official policy of CCDOC to deny inmates medical care. Therefore, to establish CCDOC's liability, plaintiff must prove that his alleged deprivation was caused by the implementation of a CCDOC custom. "An act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404. Faced with this standard, plaintiff has failed to come forward with evidence of similar denials of medical care to inmates at CCDOC. Consequently, any proof of a custom possessing the force of law must come from his personal experiences at CCDOC. As noted in *Monell*, in order for a practice to be a custom with the force of law, the practice must approach permanence and be well-settled. 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

On June 8, plaintiff requested to be sent to Cermak and was taken there for treatment by Dr. Patrimakos (Pl.'s Add'l Facts ¶ 80). Plaintiff was also seen at Cermak on July 14, 1994 (Defs.' Facts ¶ 62), even though, despite his request, he was not sent to Cermak for a follow-up visit on June 9 (Pl.'s Add'l Facts ¶ 83) (Defs.' Facts ¶ 62; Pl.'s Add'l Facts ¶¶ 80, 83). In September 1994, when the vision in his left eye failed, the tier officer sent plaintiff directly to the dispensary; and, although he requested to go to Cermak, Cermak did not send for him (Pl.'s Add'l Facts ¶ 90; Defs.' Reply ¶ 90). The plaintiff has admitted, however, that he was seen at Cermak, Cook County and the University of Illinois hospitals "numerous times" afer July 14, 1994, and had "multiple eye surgeries" during that time.

This narrative presents an unfortunate sequence of events, and we do not seek to minimize the harm caused by a loss of sight. However, there is no evidence that a CCDOC staff member denied the defendant access to medical care. *See Holmes*, 930 F.2d at 1202 n.4 (holding that evidence of plaintiff's situation alone, an eight month delay, was insufficient to establish "persistent and widespread" practice of neglecting inmate medical needs). In fact, the Division 6 tier officer's repeated "referrals" of plaintiff to the dispensary for medical treatment cuts against any custom of denying inmates medical treatment. *See Nyman v. Winnebago County*, 165 F.3d 587, 592 (7th Cir. 1999) (holding summary judgment proper because defendants' repeated responses to plaintiff's needs over the course of his incarceration undermined any inference of deliberate indifference). Plaintiff also has failed to demonstrate how the failed referrals to Cermak were due to the actions or inaction of CCDOC employees or how CCDOC policy makers may have been aware of these failed attempts.

Lastly, given the fact that plaintiff has pointed to no deliberate action taken by CCDOC employees to deny him medical treatment, his claim is one of inaction – CCDOC's failure to ensure that he received proper medical attention from Cermak staff. However, a mere negligent failure to follow-up on plaintiff's medical treatment will not support a finding of deliberate indifference. And, insofar as his claim alleges CCDOC's deliberate indifference due to inadequate policies, *Holmes* is instructive. In *Holmes*, the plaintiff claimed that the defendant's failure to take him to a follow-up appointment for more than eight months, which caused his skin condition to worsen, was due to the County's deliberate indifference in failing to institute adequate procedures to ensure the inmates' proper medical care. *Holmes*, 930 F.2d at 1198-99. The appeals court noted that the County had

presented evidence of procedures to ensure the proper medical care of inmates. Those procedures included paramedics visiting the tier on a daily basis, a doctor assigned to each division of the jail, and an internal grievance system for inmate complaints. In holding that summary judgment should have been granted, the appeals court noted that these procedures, taken together, showed that the County's policy was indeed adequate, and there was no evidence to show the County's deliberate indifference. *Id.* at 1201-02. In the present case, uncontested evidence has been introduced to show that these procedures are still in place. Plaintiff has admitted that paramedics came to the tiers on a daily basis; he was sent to the division's sick call doctor; and there was a grievance system in place. In light of *Holmes* and the lack of evidence presented, this Court finds no genuine issue of material fact upon which a reasonable jury could find the Executive Director to have been deliberately indifferent to plaintiff's medical needs. Summary judgment will therefore be granted.

## CONCLUSION

For the reasons given above, defendant's motion for summary judgment (doc. # 94) is granted. The Court therefore directs the Clerk of the Court to enter final judgment for defendants and against the plaintiff on Counts I and III of the First Amended Complaint, pursuant to Federal Rule of Civil Procedure 58. This case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: June 1, 2001**